UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
LORI HOWARD,

                           Plaintiff,           CIVIL ACTION NO.

            v.

                                  COMPLAINT

TRINET GROUP, INC.,

                           Defendant.
---------------------------------------------------------------------X

       Plaintiff Lori Howard, by her attorneys, Katz Melinger PLLC, complaining of the defendant, TriNet Group, Inc. ("TriNet" or "Defendant"), states, upon information and belief, as follows:

## I.      Nature of Action, Jurisdiction, and Venue

    1.      This is an action seeking equitable and legal relief for Defendant's violations of the New York Labor Law ("NYLL") §§ 190 *et seq.*; the New Jersey Wage Payment Act, N.J.S.A. 34:11-4.1, *et seq.* ("NJWPA"); the New York State Executive Law, Human Rights Law, § 290 *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Administrative Code Title 8 ("NYCHRL"); and for breach of contract, quantum meruit, unjust enrichment, and any other cause of action which can be inferred from the facts set forth herein.

    2.      The jurisdiction of this Court is invoked under 28 U.S.C. § 1332.

    3.      Venue is proper pursuant to 28 U.S.C. §1391, as a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## II.      Parties

    4.      Plaintiff Lori Howard is an individual residing in the State of New Jersey.

    5.      At all relevant times, defendant TriNet Group, Inc. was, and still is, a foreign

business corporation incorporated under the laws of the State of Delaware with its principal place of business located at One Park Place, Suite 600, Dublin, California 94568.

6. At all relevant times, Plaintiff was an employee of Defendant, and Defendant was Plaintiff's employer, as those terms are defined by the NYLL, NJWPA, NYSHRL, and NYCHRL.

### III.   Factual Allegations

### Background

7. TriNet is a Professional Employer Organization ("PEO") that provides small and mid-size companies with outsourced human resources, payroll, benefits, risk and compliance, and technology services.

8. Defendant is a publicly traded corporation with offices located throughout the United States, including in the states of New York and New Jersey.

9. Plaintiff was employed by Defendant as a sales representative.

10. As a sales representative, Plaintiff was responsible for fostering relationships with insurance brokers and general agents ("GAs"), to whom Plaintiff would promote TriNet's platform of products and/or services for a particular range of clients.

11. Plaintiff spent the majority of her work time traveling throughout the tristate area, mostly in New York, and meeting with brokers, GAs, and potential leads to try and generate business.

12. Plaintiff also worked remotely from her home in New Jersey, and occasionally reported to Defendant's office in White Plains, New York, until in or around 2016, and to Defendant's office in Edison, New Jersey from in or around 2016 until her resignation in May 2018.

13. Sales representatives were tasked with selling a particular set of products and/or

services, known as 'verticals', to certain groups of businesses.

14.     During her employment with TriNet, until in or around July 2017, Plaintiff was responsible for selling TriNet's 'Main Street' vertical to blue and 'light' blue-collar businesses (e.g. hospitality, property management, manufacturing, and janitorial) as well as grey-collar businesses (e.g. nursing, sales, and skilled tradespeople).

15.     Once Plaintiff, or any other sales representative, established a relationship with a broker or GA, and that broker or GA agreed to offer TriNet's platform of products and/or services to its clients, all sales generated from that broker or GA within the sales representatives' vertical were credited to the sales representative who established the relationship with that broker or GA, including sales closed by other sales representatives at TriNet.

16.     This exclusive relationship between brokers/GAs and sales representatives was not only a foundation of TriNet's policies and procedures, but was a widely-followed practice throughout the PEO industry.

## PGP

17.     A substantial portion of Plaintiff's claims relate to commissions that Plaintiff is owed based on her relationship with a single GA, Professional Group Plans ("PGP").

18.     Plaintiff first sold PEO services through PGP in or around 2009, while Plaintiff was working in a similar role at AlphaStaff, Inc., a Florida corporation with its principal place of business located in Florida.

19.     In or around November 2010, Plaintiff left her employment with AlphaStaff and began working as a Regional Business Development Manager at Strategic Outsourcing, Inc. ("SOI"), a Delaware corporation with its principal place of business located in North Carolina.

20.     Although her title changed, Plaintiff's role as a Regional Business Development

Manager at SOI was similar to her role as a sales representative at AlphaStaff.

21.     After joining SOI, Plaintiff continued her relationships with several of the brokers and GAs with whom Plaintiff worked while at AlphaStaff, and began selling SOI's platform of products and/or services through said brokers and GAs, including PGP.

22.     During her employment with AlphaStaff, Plaintiff received commissions on all sales generated by PGP from its sale of AlphaStaff's products and/or services.

23.     During her employment with SOI, Plaintiff received commissions on all sales generated by PGP from its sale of SOI's products and/or services.

24.     On or about October 25, 2012, TriNet acquired SOI in a merger.

25.     Although TriNet was the successor entity after the merger, SOI operated as a distinct entity from TriNet until in or around October 2013.

26.     Indeed, Plaintiff and other SOI employees continued to be compensated through SOI until in or around October 2013, at which point they were placed on TriNet's payroll.

27.     TriNet did not take over the direct management of SOI and its employees until in or around late 2014 or early 2015.

28.     However, even after TriNet took over the management of SOI, TriNet continued to operate SOI as a separate division or department.

29.     For example, sales representatives at SOI continued to be paid according to SOI's commission structure, which differed from the commission structure for TriNet's sales representatives.

30.     While employed by SOI and TriNet, Plaintiff was consistently one of the top salespeople in her region, if not in the entire company.

31.     Plaintiff was an exemplary salesperson who generated tremendous amounts of

business for SOI and TriNet, and was extremely well-respected by her colleagues and the brokers and GAs with whom she worked.

32.     After TriNet acquired SOI, Plaintiff continued to conduct business through many of the brokers and GAs with whom she had worked while at AlphaStaff and/or SOI, including PGP.

33.     After merging with TriNet, SOI, operating as a division or department within TriNet, continued to sell its products and/or services to blue and grey-collar businesses, while TriNet sold its products and/or services to white-collar businesses.

34.     As a result, PGP and other brokers and GAs were selling TriNet's products and/or services to its blue and grey-collar clients through Plaintiff and other SOI sales representatives, while simultaneously selling TriNet's products and/or services to its white-collar clients through its designated TriNet sales representatives.

35.     When a broker or GA sold TriNet's products and/or services to a blue or grey-collar client, that broker or GA split the commissions from the sale with its designated SOI sales representative; and when the broker or GA sold TriNet's products and/or services to a white-collar client, that same broker or GA would split the commissions from the sale with its designated TriNet sales representative.

36.     Between in or around October 2012, when TriNet acquired SOI, and in or around August 2015, well after TriNet took over the management of SOI and converted Plaintiff and all other former SOI employees to TriNet's payroll, Plaintiff received commissions on all sales of TriNet's products and/or services to PGP's blue and grey-collar clients.

**Commissions**

37.     According to SOI's compensation structure, Plaintiff and other sales representatives who sold TriNet's products and/or services exclusively through brokers and GAs, as opposed to those who sold TriNet's products and/or services directly to clients, split commissions equal to 35% (and sometimes up to 40%) of the annual commissionable administration fees charged to the client with brokers and GAs, at proportions negotiated by and among the sales representative and the broker/GA on each sale.

38.     Under SOI's compensation structure, sales representatives received commissions as long as the client continued to purchase products and/or services, or until the sales representative's employment was terminated, whichever occurred first.

39.     Commissions were paid on a three-year 'step down' formula, under which commissions were reduced by 30% each year over a three-year period, as follows: 100% of the sales representative's portion of the commissions were paid to the sales representative in the first year after the deal closed; 70% of those commissions were paid in the second year after the deal closed; 49% of the commissions were paid in the third year after the deal closed; and 34.3% of the commissions were paid in the fourth year after the deal closed and in every year thereafter.

40.     However, once a sales representative's sales reached $20 million in gross annual payroll for the year, the sales representative qualified for an accelerator, which increased the sales representative's initial commission percentage to 130% of the annual commissionable administration fees on all deals closed by the sales representative.

41.     Therefore, if the sales representative reached his or her quota and qualified for the accelerator, then his or her commissions under the three-year step-down would be as follows: 130% of his or her commissions in the first year after the deal closed; 91% of commissions in the

second year; 63.7% in the third year; and 44.59% in the fourth year and in every year thereafter.

42.     During the relevant period, Plaintiff always met her sales quota, and therefore always qualified for the accelerator.

43.     Until in or around January 2015, as Plaintiff continued to operate under SOI, Plaintiff was compensated under the commission structure outlined above.

44.     However, in 2015, TriNet took two (2) separate unlawful actions which greatly reduced Plaintiff's compensation.

45.     First, in or around January 2015, TriNet imposed a five-year step down structure on Plaintiff and all other SOI sales representatives, extending the 30% annual reduction in commissions for an additional two (2) years.

46.     Under the five-year step-down plan, Plaintiff's commissions under the accelerator were as follows: 130% in the first year after the deal closed; 91% in the second year; 63.7% in the third year; 44.59% in the fourth year; 31.213% in the fifth year; and 21.8491% in the sixth year and in every year thereafter.

47.     As a result of the five-year step-down plan, Plaintiff lost, and TriNet withheld, an additional 13.377% of Plaintiff's commissions in the fifth year, and an additional 22.7409% of Plaintiff's commissions in the sixth year and in every year thereafter, on any deals that Plaintiff closed compared to the commissions Plaintiff received under the three-year step-down plan.

48.     TriNet imposed this commission structure not only on deals that Plaintiff closed after the five-year step-down plan was implemented, but also on deals that Plaintiff had closed before the five-year step-down plan was introduced, under which Plaintiff had negotiated splits of commissions based on the expectation that she would be compensated pursuant to the three-year step-down plan.

49.     The commissions that Plaintiff was set to receive under the three-year step-down structure were earned commissions, as they resulted from deals that Plaintiff had closed months and even years earlier, and therefore constituted wages under the NYLL and NJWPA.

50.     By imposing a five-year step-down policy on deals that Plaintiff had already closed, TriNet unlawfully deducted Plaintiff's wages by withholding commissions that Plaintiff had earned prior to the implementation of this new policy and, in some cases, on deals that Plaintiff had closed before TriNet had even acquired SOI.

51.     When Plaintiff complained about this new commission structure to Jeff Melesky, Vice President of Sales and Plaintiff's direct supervisor, Melesky advised Plaintiff that she would be "subject to termination" if she did not accept the new compensation structure.

52.     Second, in or around August 2015, John Dnyprowsky, Regional Vice President of Sales at TriNet and Plaintiff's second-level supervisor, advised Plaintiff that she would be summarily removed from PGP's account and would no longer be entitled to any commissions generated by PGP, including for products and/or services sold to blue and grey-collar businesses.

53.     In her place, Dnyprowsky assigned PGP's account to Joseph D'Onofrio, a Caucasian male employee who, upon information and belief, had no prior connection to PGP.

54.     Dnyprowsky did not provide Plaintiff with any explanation for his decision to remove Plaintiff from PGP's account.

55.     Upon information and belief, no other TriNet sales representative was removed from a broker's or GA's account which the sales representative had established, unless the broker or GA specifically asked for the sales representative to be removed, which was rare.

56.     However, even in instances in which a sales representative was removed from an account at the request of the broker or GA, the sales representative still received at least a portion

of the commissions generated under the account.

57.     Plaintiff spoke with her contact at PGP, who advised Plaintiff that PGP had not requested that Plaintiff be removed from the account.

58.     Pursuant to SOI's and TriNet's policies and procedures and/or patterns and practices, Plaintiff was entitled to continue earning commissions from any revenues generated by PGP from the sale of products and/or services to blue and grey-collar businesses.

59.     Based on her past commissions, Plaintiff estimates that she would have earned approximately $200,000.00 in commissions on new deals closed with PGP in the first year after she was removed from PGP's account.

60.     Based on the three-year step-down structure, Plaintiff therefore estimates that she lost approximately $405,000.00 in commissions between in or around August 2015 and in or around May 2018, when Plaintiff resigned from TriNet, on deals that Plaintiff would have closed with PGP in the first year after she was removed from PGP's account.

61.     Including the deals that Plaintiff believes she would have closed with PGP throughout 2016, 2017, and the first part of 2018, Plaintiff estimates that she would have earned approximately $725,000.00 in commissions prior to her resignation had she not been removed from PGP's account and denied all commissions earned through the sale of products and/or services to PGP's blue and grey-collar clients.

62.     By removing Plaintiff from PGP's account and depriving her of the commissions generated on said account, TriNet unlawfully deducted Plaintiff's wages in violation of NYLL § 193, and failed to timely pay Plaintiff her earned commissions in violation of NYLL § 191 and/or N.J.S.A. 34:11-4.2.

**Gender Discrimination**

63.     In addition to violating TriNet's policies and procedures and/or patterns and practices, Dnyprowsky's decision to remove Plaintiff from PGP's account also followed a pattern and practice of discrimination based on sex and/or gender at TriNet.

64.     Upon information and belief, Dnyprowsky is a Caucasian male.

65.     Throughout Plaintiff's employment with TriNet, Dnyprowsky exhibited a pattern and practice of discrimination towards women, as well as male chauvinism and favoritism towards men, and in particular Caucasian men.

66.     Although Dnyprowsky's conduct was well-known amongst TriNet's employees, managers, and human resources department, TriNet did not discipline or otherwise take corrective action against Dnyprowsky, or any of the other male employees who exhibited clear biases in favor of Caucasian men and against women.

67.     Instead, TriNet took efforts to protect, promote, and accommodate these employees, or at the very least turn a blind eye to their discriminatory and wildly inappropriate conduct, to the detriment of its female employees.

68.     Initially, TriNet's bias against women is illustrated by the composition of TriNet's management team, which is predominantly comprised of Caucasian males.

69.     Indeed, very few women hold positions of power within TriNet.

70.     For example, according to TriNet's website, TriNet's executive team consists of ten (10) employees, nine (9) of whom are or appear to be Caucasian males.

71.     The tenth and only female member of TriNet's executive team, the Senior Vice President of Human Resources, only joined TriNet in 2017.

72.     TriNet's Board of Directors is similarly composed of predominantly Caucasian

males, as well as one female.

73.     During Plaintiff's employment with TriNet, Plaintiff witnessed TriNet consistently promote male employees, and in particular Caucasian male employees, over equally or more qualified female employees, including Plaintiff.

74.     Additionally, TriNet appeared to go out of its way to protect certain male employees, or at the very least to ignore indiscretions which, if carried out by female employees, would have likely led to their termination.

75.     For example, upon information and belief, at a company Christmas party, Dnyprowsky attempted to kiss a female coworker while her fiancée was in the next room.

76.     Upon information and belief, Dnyprowsky physically assaulted another female employee by slapping her on her buttocks.

77.     Upon information and belief, Dnyprowsky made sexually suggestive remarks both to and about female subordinates, such as making the comment, "I'd do that" when an attractive female employee walked by.

78.     Dnyprowsky's decisions as a manager also reflected his discriminatory bias against women.

79.     For example, at one point during her employment, Plaintiff was assigned a sales assistant who supported Plaintiff and helped her complete administrative duties.

80.     After Plaintiff's sales assistant resigned, Plaintiff was not permitted to hire another sales assistant, although Dnyprowsky hired a sales assistant to assist one of Plaintiff's male colleagues, even though said male colleague generated only a fraction of Plaintiff's production and therefore had much less of a need for an assistant than Plaintiff.

81.     Upon information and belief, in or around August 2017, Dnyprowsky was arrested

in Florida for driving under the influence in a vehicle that was rented by TriNet.

82.     Rather than terminate him, TriNet permitted Dnyprowsky to take a leave of absence and later return to work.

83.     Dnyprowsky called a meeting to be held on his first day back to work from leave, which Plaintiff was unable to attend due to family obligations.

84.     Upon information and belief, Dnyprowsky became enraged when he learned that Plaintiff would not be attending the meeting, and complained about Plaintiff's absence to several individuals both during and after the meeting.

85.     Upon information and belief, Dnyprowsky did not complain about another employee, a Caucasian male, who was also unable to attend the meeting.

86.     Upon information and belief, later that week, Dnyprowsky, who was still apparently irked by Plaintiff's absence from the meeting held days earlier, disparaged and slandered Plaintiff to other managers during a conference call, claiming, among other things, that Plaintiff did not truly establish her own broker and GA relationships and therefore should not receive commissions on said relationships.

87.     Dnyprowsky's comments were patently false, and, upon information and belief, one or more of the managers on the conference call confronted and corrected Dnyprowsky regarding his fallacious remarks.

88.     Along with being untrue, Dnyprowsky's comments were also brazenly hypocritical, in light of the fact that Dnyprowsky had removed Plaintiff from PGP's account, which Plaintiff had established nearly a decade prior, and gave the account to D'Onofrio, who had no prior relationship with PGP.

89.     However, Dnyprowsky was not the only Caucasian male supervisor employed by

Defendant that habitually harassed and discriminated against women, including Plaintiff.

90.     Melesky, Plaintiff's direct supervisor, who is a Caucasian male, also exhibited a pattern and practice of discrimination against and harassing women, and similarly faced no repercussions from Defendant for his actions.

91.     In fact, despite Melesky's treatment of women, of which, upon information and belief, TriNet was made aware through numerous complaints filed against him, Melesky is still employed by and has since received promotions from TriNet.

92.     For example, upon information and belief, Melesky, who is married, had an affair with and impregnated a female subordinate.

93.     Upon information and belief, Melesky's wife showed up to a meeting attended by Melesky and other TriNet employees to confront Melesky about the affair, which did not result in any corrective action being taken against Melesky.

94.     Upon information and belief, Melesky brought a female acquaintance, who did not work at TriNet and with whom Melesky was believed to be romantically involved, to a company event in Florida, which made many of the employees in attendance uncomfortable since they knew that Melesky was married at the time.

95.     Upon information and belief, Melesky sent friend requests to female subordinates on social media, which is against TriNet's code of conduct, and interrogated these female employees when they either declined Melesky's connection request or accepted the request and later 'unfriended' Melesky on the social media application.

96.     Upon information and belief, certain female employees asked not to be left alone with Melesky during company events or when traveling for work.

97.     Upon information and belief, although both Dnyprowsky and Melesky had

numerous complaints filed against them with TriNet's human resources department, no corrective action was ever taken against either of them.

98.     Upon information and belief, other male employees employed by Defendant engaged in similar conduct without consequence during Plaintiff's employment.

99.     The culture of discrimination against and harassment of women at TriNet was well-known throughout the company.

100.    Dnyprowsky removed Plaintiff from PGP's account because Plaintiff is a woman.

101.    As a result of Defendant's discriminatory practices, including Dnyprowsky's decision to remove Plaintiff from PGP's account, Plaintiff has been damaged in an amount no less than $725,000.00.

### Unlawful Charge Backs

102.    In addition to TriNet's unlawful implementation of the five-year step-down policy and removal of Plaintiff from PGP's account, TriNet also unlawfully clawed back Plaintiff's earned commissions.

103.    Until in or around 2017, sales representatives who worked under SOI were compensated under a different commission structure than their counterparts who worked directly for TriNet.

104.    While the sales representatives at SOI were compensated under the three or five-year step-down structure, sales representatives employed directly by TriNet earned an initial commission equal to 15% of the annual contract value ("ACV") of any deal they sold, as well as 10% of the administrative fees billed to the client each month for the first twelve (12) months of the contract.

105.    Once a sales representative hit his or her annual quota for the year, which amounted

to $464,000.00 in sales, the sales representative was eligible for an accelerated commission structure, under which the sales representative would receive commissions equal to 22.5% of the ACV and 15% of the monthly administrative fees charged to the client.

106.   However, after the first year, the sales representative received no further commissions on the deals they closed.

107.   Additionally, if a client cancelled its contract with TriNet within one (1) year, then TriNet would claw back any commissions paid to the sales representative on the deal.

108.   In or around 2017, TriNet changed the compensation policy for Plaintiff and the other SOI sales representatives, bringing them under TriNet's twelve (12) month commission structure.

109.   As she had always done, Plaintiff quickly exceeded her annual quota of $464,000.00 under the new commission structure, and therefore began earning commissions on all deals at the accelerated rate.

110.   However, clients began complaining to Plaintiff that the Main Street vertical, which Plaintiff was responsible for selling, was inadequate and/or defective, leading many clients to cancel their contracts within the first year.

111.   As a result, TriNet began taking deductions from Plaintiff's compensation to 'claw back' the commissions that Plaintiff had received on contracts that her clients cancelled within the first year.

112.   However, when TriNet began clawing back Plaintiff's commissions, it did so at the accelerated commission rate for all of the commissions Plaintiff had received, including on commissions that Plaintiff received prior to reaching her annual quota.

113.   For example, if Plaintiff reached her quota six (6) months into the year, and a client

cancelled its contract after seven (7) months, TriNet would charge Plaintiff back for 22.5% of the ACV and 15% of the monthly administrative fees charged to the client under the deal for the entire seven (7) month period, even though Plaintiff only received 15% of the ACV and 10% of the monthly administrative fees for the first six (6) months of that contract.

114.    As a result, TriNet deducted more commissions from Plaintiff than it actually paid to her.

115.    Plaintiff brought this issue to the attention of several senior executives at TriNet, who acknowledged the issue but failed to resolve it.

116.    TriNet unlawfully deducted Plaintiff's earned commissions by charging all of her commissions back at the accelerated commission rates.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
(*Unlawful Deductions under the NYLL*)

117.    Plaintiff repeats and realleges all prior allegations set forth above.

118.    NYLL § 193(1) prohibits employers from making any deductions from an employee's wages, except for those permitted by law.

119.    Defendant made unlawful deductions from Plaintiff's wages, namely from Plaintiff's earned commissions.

120.    Specifically, Defendant's implementation of the five-year step-down policy on deals that Plaintiff closed under SOI's three-year step-down policy caused Plaintiff to forfeit portions of Plaintiff's commissions that she had already earned.

121.    Moreover, by removing Plaintiff from PGP's account, Defendant unlawfully deducted and withheld hundreds of thousands of dollars in commissions which Plaintiff had earned and to which she was entitled under TriNet's own policies and/or practices.

122.    Additionally, Defendant failed to properly implement its clawback policy, which

resulted in Plaintiff being charged back more commissions than she actually received on sales that clients cancelled within one (1) year.

123.    Defendant's knowing and intentional deductions were willful violations of the NYLL and supporting Department of Labor Regulations.

124.    As a result of Defendant's violations of the law and unlawful deductions from Plaintiff's wages, Plaintiff has been damaged and is entitled to recover from Defendant all wages due, along with all reasonable attorneys' fees, interest, and costs.

125.    As Defendant did not have a good faith basis to believe that its failure to pay Plaintiff all wages due was in compliance with the law, Plaintiff is entitled to liquidated damages.

126.    Judgment should be entered in favor of Plaintiff and against Defendant on the First Cause of Action in the amount of Plaintiff's unlawfully deducted wages, liquidated damages, attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Failure to Timely Pay Wages Under the NYLL)*

127.    Plaintiff repeats and realleges all prior allegations.

128.    Throughout the relevant time period, Defendant failed to pay Plaintiff in accordance with the agreed-upon terms of their employment by failing to pay Plaintiff all of the wages she is owed, in violation of NYLL § 191.

129.    The foregoing conduct of Defendant constitutes a willful violation of the NYLL for which Plaintiff is entitled to an award of liquidated damages.

130.    Judgment should be entered in favor of Plaintiff and against Defendant on the Second Cause of Action in the amount of Plaintiff's unpaid wages, liquidated damages, attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Failure to Timely Pay Commissions in Violation of New Jersey Wage Payment Law)*

131.    Plaintiff repeats and realleges all prior allegations.

132.    At all relevant times, Defendant failed to pay Plaintiff the full amount of commissions due at least twice during each calendar month on regular pay days designated in advance, in violation of N.J.S.A. 34:11-4.2.

133.    Defendant also failed to pay Plaintiff all commissions due not later than the regular payday for the pay period during which she resigned, in violation of N.J.S.A. 34:11-4.3.

134.    As a result of Defendant's violations of the law and failure to pay Plaintiff all commissions due in a timely manner, Plaintiff has been damaged and is entitled to recover from Defendant all unpaid commissions, plus liquidated damages, interest, and costs.

135.    Judgment should be entered in favor of Plaintiff and against Defendant on the Third Cause of Action for all unpaid commissions, liquidated damages, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
*(Breach of Contract)*

136.    Plaintiff repeats and realleges all prior allegations.

137.    Pursuant to the Defendant's policies and procedures, Plaintiff was entitled to receive commissions on any revenue generated by brokers and GAs with whom Plaintiff had an exclusive relationship.

138.    Pursuant to Defendant's compensation policies and procedures, these commissions became due upon Defendant's receipt of its fees.

139.    Plaintiff was the exclusive sales representative for PGP's blue and grey-collar clients, and was entitled to receive all commissions generated from the sale of TriNet's products

and/or services to PGP's blue and grey-collar clients.

140.    In or around August 2015, Dnyprowsky removed Plaintiff from PGP's account, and caused all future commissions on the account to be paid to D'Onofrio.

141.    Defendant breached its compensation policies and procedures by failing to pay Plaintiff all commissions due on the PGP account.

142.    As a result of Defendant's breach of its compensation policies and procedures, Plaintiff has been damaged and is entitled to recover from Defendant all commissions due, along with interest and costs.

143.    Judgment should be entered in favor of Plaintiff and against Defendant on the Fourth Cause of Action in the amount of Plaintiff's unpaid commissions, in an amount to be determined by this Court, but no less than $725,000.00, plus costs and interest.

<u>**AS AND FOR A FIFTH CAUSE OF ACTION**</u>
*(Unjust Enrichment)*

144.    Plaintiff repeats and realleges all prior allegations.

145.    During her employment with Defendant, Plaintiff sold a substantial amount of Defendant's products and/or services through her relationship with PGP.

146.    Plaintiff's performance of her duties generated significant revenues for Defendant.

147.    Plaintiff expected remuneration from Defendant at the time she performed or conferred a benefit on Defendant.

148.    Defendant accepted the benefits of these transactions and received substantial fees as a result.

149.    Defendant has refused to pay Plaintiff commissions for these transactions, and has been unjustly enriched at Plaintiff's expense.

150.    It would be inequitable and unconscionable to permit Defendant to retain the full

value of the transactions Plaintiff facilitated without fair compensation to Plaintiff.

151.    Equity demands that Defendant be compelled to pay for this benefit.

152.    Judgment should be entered in favor of Plaintiff and against Defendant on the Fifth Cause of Action for the fair and reasonable value of Plaintiff's services, in an amount to be determined by this Court, but no less than $725,000.00, plus costs and interest.

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Quantum Meruit)*

153.    Plaintiff repeats and realleges all prior allegations set forth above.

154.    Plaintiff provided services to Defendant with Defendant's knowledge and approval.

155.    Specifically, Plaintiff sold TriNet's products and/or services to PGP's blue and grey-collar clients, from which TriNet received a substantial amount of revenue.

156.    Plaintiff has not been paid a fair and reasonable value for her services.

157.    Plaintiff is owed payment for the fair and reasonable value of the services she provided to Defendant.

158.    It is improper for Defendant to retain the benefit of the services provided by Plaitiff without making payment in full.

159.    Defendant has been unjustly enriched by Plaintiff.

160.    Defendant is obligated to pay the fair and reasonable value for the services Plaintiff provided.

161.    Judgment should be entered in favor of Plaintiff and against Defendant on the Sixth Cause of Action for the fair and reasonable value of Plaintiff's services, in an amount to be determined by this Court, but no less than $725,000.00, plus costs and interest.

## AS AND FOR A SEVENTH CAUSE OF ACTION
*(New York State Executive Law, Human Rights Law, § 290 et seq.)*
(Gender Based Discrimination)

162.    Plaintiff repeats and realleges all prior allegations.

163.    Defendant subjected Plaintiff to offensive and unwelcome conduct, an intimidating, hostile, and offensive work environment, disparate treatment, and discrimination based on her gender.

164.    Defendant's disparate and unlawful treatment of Plaintiff on the basis of her gender was in violation of the NYSHRL.

165.    Dnyprowsky's and Melesky's conduct towards female employees, and specifically Plaintiff, through their comments and actions, give rise to an inference of unlawful discrimination.

166.    Defendant subjected Plaintiff to disparate treatment and adverse employment action which other employees outside of her protected class, female, were not subjected to.

167.    Defendant is liable for Dnyprowsky's and Melesky's actions, which resulted in the victimization of Plaintiff by creating a hostile environment, disparate treatment, and gender discrimination.

168.    As a proximate result of Defendant's discrimination against Plaintiff, Plaintiff has suffered substantial losses, including the loss of past earnings.

169.    As a further proximate result of Defendant's actions taken because of Plaintiff's gender, she has suffered and continues to suffer severe and lasting embarrassment, humiliation, and anguish, and other incidental and consequential damages and expenses.

170.    Judgment should be entered in favor of Plaintiff and against Defendant on the Seventh Cause of Action for all compensatory, emotional, physical, and liquidated damages, along with lost pay, front pay, the costs and disbursements of this action, and any other damages

permitted by law in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Gender-Based Discrimination)

171.    Plaintiff repeats and realleges all prior allegations.

172.    Dnyprowsky, Melesky, and other male employees at TriNet engaged in a pattern and practice of objectifying female coworkers and subordinates, promoting male employees over equally or more qualified female employees, and otherwise treating female employees less well than their male counterparts.

173.    TriNet condoned, or at least ignored, the overt discrimination exhibited by these male employees despite receiving numerous complaints about their inappropriate conduct.

174.    Plaintiff was the subject of Dnyprowsky's unlawful discriminatory conduct on several occasions, including in or around August 2015 when Dnyprowsky removed Plaintiff from PGP's account and assigned the account to D'Onofrio.

175.    Defendant treated Plaintiff less well than her male coworkers on the basis of her gender, in violation of the NYCHRL.

176.    Judgment should be entered in favor of Plaintiff and against Defendant on the Eighth Cause of Action for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, reasonable attorneys' fees, the costs and disbursements of this action, and any other damages permitted by law in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests, pursuant to FRCP 38 (b), a jury trial on all claims so triable.

**WHEREFORE**, Plaintiff prays for judgment as follows:

a)  on the First Cause of Action in favor of Plaintiff and against Defendant for all unlawful deductions, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court;

b)  on the Second Cause of Action for all wages due to Plaintiff, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court;

c)  on the Third Cause of Action in favor of Plaintiff and against Defendant for all unpaid commissions and liquidated damages;

d)  on the Fourth Cause of Action in favor of Plaintiff and against Defendant for all unpaid commissions in an amount to be determined by this Court, but no less than $725,000.00;

e)  on the Fifth Cause of Action in favor of Plaintiff and against Defendant for the fair and reasonable value of Plaintiff's services in an amount to be determined by this Court, but no less than $725,000.00;

f)  on the Sixth Cause of Action in favor of Plaintiff and against Defendant for the fair and reasonable value of Plaintiff's services in an amount to be determined by this Court, but no less than $725,000.00;

g)  on the Seventh Cause of Action in favor of Plaintiff and against Defendant for all compensatory, emotional, physical, and liquidated damages, along with lost pa and front pay;

h)  on the Eighth Cause of Action in favor of Plaintiff and against Defendant for all compensatory, emotional, physical, liquidated, and punitive damages, if

applicable, along with lost pay, front pay, and reasonable attorneys' in an amount to be determined at trial;

i)  interest;

j)  costs and disbursements;

k)  and such other and further relief as the Court shall deem just and proper.


Dated: New York, New York
       August 10, 2018


                                    */s/ Adam Sackowitz*
                                    Adam Sackowitz
                                    Katz Melinger PLLC
                                    280 Madison Avenue, Suite 600
                                    New York, New York 10016
                                    Telephone: (212) 460-0047
                                    Facsimile: (212) 428-6811
                                    ajsackowitz@katzmelinger.com
                                    *Attorneys for Plaintiff*